No. 99-146

IN THE SUPREME COURT OF THE STATE OF MONTANA

2000 MT 64

299 Mont. 62

997 P. 2d 776

IN THE MATTER OF C.H.,

A Youth in Need of Care.

APPEAL FROM: District Court of the Eighteenth Judicial District,

In and for the County of Gallatin,

The Honorable Thomas A. Olson, Judge presiding.

COUNSEL OF RECORD:

For Intervenors and Appellants Scott and Tena Ehret:

Trudy Flamand Miller, Attorney at Law, Helena, Montana

For Intervenor and Appellant Confederated Tribes of Siletz Indians:

Maylinn Smith, Indian Law Clinic, Missoula, Montana

For Respondent State of Montana:

Hon. Joseph P. Mazurek, Attorney General, Helena, Montana;

Marty Lambert, Gallatin County Attorney, Bozeman, Montana

For Intervenors and Respondents Doug and Janinie Burrows-Alberda:

Urban J. Bear Don't Walk, Attorney at Law, Billings, Montana

For Amicus Curiae National Indian Child Welfare Association:

Michelle L. Clark, Student Attorney, Anita Fineday, Supervising

Attorney, Indian Child Welfare Law Center, Minneapolis, Minnesota

Debra DuMontier, Attorney at Law, Confederated Salish and

Kootenai Tribes, Pablo, Montana

For Amicus Curiae National Council for Adoption:

Christine D. Esser, Attorney at Law, Milwaukee, Wisconsin

_____

Submitted on Briefs: August 26, 1999

Decided: March 16, 2000

Filed:

_____

Clerk

Justice Karla M. Gray delivered the Opinion of the Court.

¶1. The Confederated Tribes of Siletz Indians of Oregon (the Tribe) and Scott and Tena Ehret (the Ehrets) appeal from the order of the Eighteenth Judicial District Court, Gallatin County, continuing the foster care placement of C.H., a youth in need of care, with Janine and Doug Alberda (the Alberdas) and authorizing the Montana Department of Public Health and Human Services (DPHHS) to commence proceedings for the Alberdas to formally adopt C.H. We reverse and remand with instructions.

¶2. The dispositive issue is whether the District Court erred in concluding that good cause exists to deviate from the adoptive placement preferences set forth in 25 U.S.C. § 1915(a).

## BACKGROUND

¶3.C.H. was born on March 19, 1997. On June 12, 1997, she was admitted to Bozeman Deaconess Hospital where it was discovered she had 16 fractured ribs in various stages of healing, as well as fresh bruises on her torso and limbs. C.H.'s examining physician determined that the rib fractures and bruising were consistent with trauma caused by an adult holding and squeezing her until her ribs broke. Based on this evidence of abuse, DPHHS placed C.H. in emergency protective custody and, upon her release from the hospital, placed her in foster care with the Alberdas. The Alberdas are not related to C.H. and are non-Indians. DPHHS subsequently petitioned for--and the District Court granted--temporary investigative authority over C.H.

¶4.DPHHS then discovered that C.H. is enrollable as a member of the Tribe and, consequently, that the abuse and neglect proceeding involving C.H. was subject to the Indian Child Welfare Act (ICWA), 25 U.S.C. §§ 1901, *et seq.* Pursuant to the ICWA, DPHHS notified the Tribe of the proceedings. On August 18, 1997, the Tribe filed motions to intervene and to transfer jurisdiction over the proceeding to the Siletz Tribal Court. The District Court granted the Tribe's motion to intervene and scheduled a hearing on the motion to transfer jurisdiction. The Tribe subsequently amended its motion to transfer jurisdiction by withdrawing its opposition to the District Court's jurisdiction over the adjudicatory phase of the abuse and neglect proceeding. It maintained its desire to acquire jurisdiction over the eventual disposition of the case, however, to ensure that C.H. was placed in a home which met the placement preferences set forth in § 1915 of the ICWA.

¶5.On July 21, 1998, DPHHS petitioned the District Court to terminate the parental rights of C.H.'s birth parents on the basis that they had signed stipulations voluntarily relinquishing their parental rights. The District Court entered its order terminating parental rights and granting custody of C.H. to DPHHS, with the right to consent to her adoption, on August 10, 1998. The court also scheduled a review hearing in January of 1999 at which DPHHS was to report regarding the permanent placement of C.H. in an adoptive home. Two days following entry of this order, the Ehrets moved to intervene in the proceeding as interested parties on the basis that Tena Ehret is a member of C.H.'s extended family, as well as a member of the Tribe, and they intended to initiate proceedings to formally adopt C.H. The District Court granted the motion.

¶6.In September of 1998, the Tribe renewed its motion to transfer jurisdiction of the case to the Siletz Tribal Court based on its concerns that DPHHS was not properly considering

the Tribe's recommendations for permanent placement of C.H. as required by the ICWA. The District Court denied the motion and scheduled an evidentiary hearing on the issues of C.H.'s permanent placement pursuant to the placement preferences set forth in § 1915 of the ICWA and whether good cause existed to avoid those placement preferences. Prior to the hearing, the Alberdas moved to intervene in the proceeding as interested parties, based on their intent to pursue formal adoption of C.H., and the District Court granted the motion.

¶7. At the evidentiary hearing in December of 1998, the Tribe and the Ehrets contended that, in determining the adoptive placement of C.H. pursuant to 25 U.S.C. § 1915(a), the District Court was required to give preference to placement with extended family members, members of the Tribe or a member of another Indian tribe. Accordingly, they argued that C.H. should be placed permanently with the Ehrets because Tena Ehret was both an extended family member and a member of the Tribe. DPHHS and the Alberdas contended that, based on C.H.'s extraordinary needs, good cause existed to deviate from the 25 U.S.C. § 1915(a) placement preferences and to allow DPHHS to place C.H. with the Alberdas on a permanent basis.

¶8. The District Court subsequently entered its findings of fact, conclusions of law and order, in which it concluded that C.H. had extraordinary physical and emotional needs which constituted good cause to deviate from the ICWA placement preferences. The court denied the proposed adoptive placement with the Ehrets and ordered that C.H. remain in her current foster care placement pending her formal adoption by the Alberdas. The Tribe and the Ehrets appeal.

## STANDARD OF REVIEW

¶9. The District Court supported its determination that good cause existed to deviate from the ICWA adoptive placement preferences with findings of fact and conclusions of law. The Tribe and the Ehrets do not dispute any of the court's findings of fact. Rather, they contend that the District Court's conclusion that those findings constitute good cause to avoid the placement preferences is erroneous. A district court's application of the law to the facts of a case is a legal conclusion which we review to determine whether the interpretation of the law is correct. Bank of Baker v. Mikelson Land Co., 1999 MT 76, ¶ 26, 294 Mont. 64, ¶ 26, 979 P.2d 180, ¶ 26.

## DISCUSSION

¶10.Did the District Court err in concluding that good cause exists to deviate from the adoptive placement preferences set forth in 25 U.S.C. § 1915(a)?

¶11.The express policy of the ICWA is to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture . . . .

25 U.S.C. § 1902. One method by which the ICWA implements this policy is to provide preferences for the adoptive placement of Indian children.

In any adoptive placement of an Indian child under State law, a preference shall be given, in the absence of good cause to the contrary, to a placement with (1) a member of the child's extended family; (2) other members of the Indian child's tribe; or (3) other Indian families.

25 U.S.C. § 1915(a). A court is required to order an adoptive placement of an Indian child in accordance with these preferences unless it concludes that good cause exists to deviate from them. Thus, the ICWA expresses the presumption that it is in an Indian child's best interests to be placed in an Indian home in conformance with the § 1915 placement preferences. Matter of Adoption of Riffle (1996), 277 Mont. 388, 393-94, 922 P.2d 510, 514 (Riffle II).

¶12.The ICWA does not define the term "good cause" as used in 25 U.S.C. § 1915(a); nor does it set forth factors to be considered in determining whether good cause exists. However, the Department of the Interior, via the Bureau of Indian Affairs (BIA), promulgated Guidelines for State Courts; Indian Child Custody Proceedings (the guidelines) to assist in the interpretation and application of the ICWA. See 44 Fed. Reg. 67,584 to 67,595 (1979). We previously have determined that these guidelines are persuasive and we apply them when interpreting the ICWA. See, e.g., Matter of Adoption of H.M.O., 1998 MT 175, ¶ 30, 289 Mont. 509, ¶ 30, 962 P.2d 1191, ¶ 30; Matter of Adoption of Riffle (1995), 273 Mont. 237, 242, 902 P.2d 542, 545; Matter of M.E.M. (1981), 195 Mont. 329, 336, 635 P.2d 1313, 1318.

¶13.The BIA's statement of policy regarding the ICWA and the guidelines is as follows:

Congress through the [ICWA] has expressed its clear preference for keeping Indian children with their families, deferring to tribal judgment on matters concerning the custody of tribal children, and placing Indian children who must be removed from their homes within their own families or Indian tribes. Proceedings in state courts involving the custody of Indian children shall follow strict procedures and meet stringent requirements to justify any result in an individual case contrary to these preferences. The [ICWA], the federal regulations implementing the [ICWA], the recommended guidelines and any state statutes, regulations or rules promulgated to implement the [ICWA] shall be liberally construed in favor of a result that is consistent with these preferences.

44 Fed. Reg. 67,585-86. With regard to the "good cause" exception to the adoptive placement preferences in 25 U.S.C. § 1915(a), the guidelines provide:

(a) For purposes of foster care, preadoptive or adoptive placement, a determination of good cause not to follow the order of preference . . . shall be based on one or more of the following considerations:

(i) The request of the biological parents or the child when the child is of sufficient age.

(ii) The extraordinary physical or emotional needs of the child as established by testimony of a qualified expert witness.

(iii) The unavailability of suitable families for placement after a diligent search has been completed for families meeting the preference criteria.

(b) The burden of establishing the existence of good cause not to follow the order of preferences . . . shall be on the party urging that the preferences not be followed.

44 Fed. Reg. 67,594. The BIA's commentary to the guidelines further addresses the consideration of an Indian child's extraordinary physical and emotional needs as constituting good cause.

In a few cases a child may need highly specialized treatment services that are unavailable in the community where the families who meet the preference criteria live. Paragraph (ii) recommends that such considerations be considered as good cause to the contrary.

44 Fed. Reg. 67,594.

¶14.Under the guidelines set forth above, it is clear that DPHHS and the Alberdas, as the parties seeking to avoid the ICWA adoptive placement preferences and place C.H. permanently with the Alberdas, had the burden in the District Court of establishing good cause to do so. To that end, they presented the testimony of several expert witnesses to demonstrate that C.H. had extraordinary physical and emotional needs. The District Court entered findings of fact based on the expert testimony and concluded that the findings established C.H. had extraordinary physical and emotional needs constituting good cause to deviate from the placement preferences set forth in 25 U.S.C. § 1915(a). The Tribe and the Ehrets assert the court erred in concluding that, based on the record in this case, good cause exists to avoid the ICWA's placement preferences. In reviewing the District Court's conclusion regarding good cause, we must keep in mind the policies of the ICWA and the guidelines, which provide that the requirements to be met before reaching any result contrary to the statutory placement preferences must be strictly applied, and that the ICWA must be liberally construed in favor of a result that is consistent with the preferences.

¶15.Briefly stated, the pertinent facts relating to C.H.'s physical and emotional condition, as set forth in the District Court's findings of fact, are as follows. C.H. currently is developing normally for a child of her age and is thriving. Although she may have been exposed to drugs and alcohol *in utero*, she exhibits no symptoms of fetal alcohol syndrome or effect; nor are there indications of other physical or psychological problems. However, as a result of the possible drug and alcohol exposure, she is at high risk for neurodevelopmental problems and emotional disorders which may not surface until later in her life.

¶16.The District Court further found that, as a result of C.H.'s emotional bond with the Alberdas and the abuse she experienced early in life, she is at risk for developing an attachment disorder should she be removed from the Alberdas' home. Although there was extensive testimony regarding attachment disorders in general, none of the expert witnesses testified that C.H. was certain to develop an attachment disorder should she be moved or that any emotional harm resulting from a change in custody would be irreparable. The record reflects that, to date, C.H. has shown great emotional resiliency.

¶17.The District Court also found that the Alberdas were experienced foster care parents who have given C.H. a safe, stable and loving home. On the other hand, the court found that, although the Ehrets had received training and were currently licensed to give foster care, they had limited experience handling children with the type of emotional problems

which C.H. may develop later in life. The court also found, however, that the Ehrets are currently giving foster care to a child with special needs due to possible fetal alcohol effect. Furthermore, DPHHS determined that C.H.'s abuser, although never actually identified, was an immediate family member. On that basis, the District Court found that, because the Ehrets are extended family members, the potential exists that C.H. would come into contact with her abuser in the future should she be placed in their home.

¶18.Based on these findings, the District Court entered a number of conclusions of law which we address in turn. In its first two conclusions, the court correctly concluded that the ICWA is applicable to this case, § 1915(a) of the ICWA provides specific preferences for adoptive placement of an Indian child absent good cause to the contrary and DPHHS had the burden of establishing that good cause existed for deviating from the preferences. In its third conclusion, the District Court noted the absence of a definition of "good cause" in the ICWA and accurately set forth the three considerations provided by the guidelines upon which a determination of good cause is to be made. The court then concluded, however, that the guidelines' provisions are merely "examples"--and not an exhaustive listing--of what may constitute good cause to avoid the placement preferences. We disagree.

¶19.The guidelines provide that a determination of good cause to avoid the preferences "shall be based on one or more of" three stated factors. 44 Fed. Reg. 67,594. At least one court has held that this language indicates that the determination of whether good cause exists to deviate from the ICWA placement preferences must be limited to consideration of the three factors set forth in the guidelines. See Matter of Custody of S.E.G. (Minn. 1994), 521 N.W.2d 357, 363. We agree with the Minnesota Supreme Court that, in light of the plain language used in the guidelines, the three expressly stated factors cannot be interpreted as merely illustrative of the circumstances which may constitute good cause. Rather, they are the only circumstances constituting good cause to avoid the § 1915(a) adoptive placement preferences. We conclude the District Court erred in determining that the factors set forth in the guidelines and the BIA's related commentary are merely examples, and not an exhaustive listing, of circumstances which constitute good cause.

¶20.In its fourth conclusion, the District Court listed, in side-by-side format, record-based positive and negative factors relative to permanently placing C.H. with the Alberdas as opposed to placing her with the Ehrets. With regard to continuing custody with the Alberdas, the court listed the following positive factors: C.H.'s dramatic healing from physical abuse while in the Alberdas' care and the hopeful prospects of emotional healing;

the Alberdas' experience with abused children; avoiding trauma to C.H. resulting from the separation from the Alberdas; avoiding the risk of an attachment disorder; protecting C.H. from hostile family; coping with fetal alcohol effect; and the Alberdas' hope to deal with adoption and cultural issues. As a negative factor, the court noted C.H. would have little exposure to Indian culture if placed with the Alberdas.

¶21.The District Court also listed the following positive factors regarding placing C.H. with the Ehrets: a promise by the Ehrets to continue C.H.'s physical and emotional healing; the Ehrets' hope to cope with fetal alcohol effect, compounded by the effect of an attachment disorder; their hope to cope with adoption and cultural issues; and exposure to C.H.'s Indian culture. As negative factors, the court noted the Ehrets' lack of experience caring for abused children; the emotional trauma to C.H. resulting from the custody change; the risk of an attachment disorder; and C.H.'s exposure to hostile family members.

¶22.The District Court then determined that "[i]f the competing factors are balanced, the scale weighs heavily, by clear and convincing evidence, in favor of retention in the Alberda home . . ." and that the listed factors "favor a finding of good cause" to avoid the ICWA placement preferences. The court's application of a balancing test weighing the benefits and detriments of placing C.H. with the Alberdas as opposed to the Ehrets is, in essence, a straightforward determination of C.H.'s best interests. See In re J.J.G., 1998 MT 28, ¶ 25, 287 Mont. 313, ¶ 25, 954 P.2d 1120, ¶ 25. However, while the best interests of the child is an appropriate and significant factor in custody cases under state law, it is improper to apply a best interests standard when determining whether good cause exists to avoid the ICWA placement preferences, because the ICWA expresses the presumption that it is in an Indian child's best interests to be placed in conformance with the preferences. Riffle II, 277 Mont. at 393-95, 922 P.2d at 514-15. Consequently, the District Court's conclusion that the stated factors weigh in favor of a determination that good cause exists is an incorrect application of the law. As a result, we conclude that the District Court's fourth conclusion of law does not support a determination that good cause exists to avoid the § 1915(a) placement preferences.

¶23.In its fifth conclusion, the District Court listed nine items it concluded were extraordinary physical and emotional needs of C.H. which constituted good cause to avoid the statutorily-preferred placement with the Ehrets and place her permanently with the Alberdas. We address each in turn to determine whether the court correctly concluded it is an extraordinary physical or emotional need.

¶24.The court's first statement of C.H.'s "extraordinary physical and emotional needs" is "[t]he presence of a healing home from which [C.H.] had been brought back from the effects of profound physical and emotional abuse." This is a statement of fact regarding C.H.'s past and present living conditions. It is not a statement of C.H.'s current needs--emotional or physical--and, as a result, we conclude it does not constitute an extraordinary need as contemplated by the guidelines.

¶25.Next, the court stated that "[t]he likelihood of an attachment disorder if the child is moved, compounded by the potentional [sic] for Fetal Alcohol Effect" constitutes an extraordinary physical or emotional need. We disagree.

¶26.First, while it is undisputed that C.H. is at risk for developing emotional or physical disorders, there is no evidence of record that such disorders exist currently or are inevitable. It has been held that emotional or physical trauma to a child resulting from a change in custody can constitute good cause to avoid the ICWA placement preferences. See Matter of Baby Boy Doe (Idaho 1995), 902 P.2d 477, 487. There, however, the expert witnesses testified unanimously that trauma was certain to result from a transfer of custody. Matter of Baby Boy Doe, 902 P.2d at 487. Here, the record is devoid of testimony that C.H. was certain to develop an attachment disorder if removed from the Alberdas' home. Nor was there testimony that she was certain to suffer from other neurodevelopmental problems.

¶27.The risk that a child might develop such problems in the future is simply too nebulous and speculative a standard on which to determine that good cause exists to avoid the ICWA placement preferences. Indeed, it could be said that any child who has been abused, removed from its parents' care at a young age and placed in foster care might be at risk for developing emotional or psychological disorders. To allow such an indefinite standard to meet the good cause test for avoiding the preferences would essentially ignore the preferences set forth in § 1915(a) of the ICWA. It also would be contrary to the express policies stated in the guidelines that the statutory placement preferences be strictly applied and the ICWA liberally construed in favor of a result consistent with the preferences. See 44 Fed. Reg. 67,586. We conclude that, in the absence of expert testimony that C.H. will develop an attachment disorder or other neurodevelopmental problems, the fact that she is at risk for such problems does not amount to an extraordinary physical or emotional need constituting good cause to avoid the ICWA placement preferences.

¶28.As its third and fourth items in the list of C.H.'s extraordinary physical and emotional

needs, the District Court noted that the Alberdas had experience in caring for over 200 foster children, many of whom had emotional disturbances, and that C.H. had been in foster care for an unusual length of time. The first item merely states the Alberdas' experience as caregivers; it does not relate to C.H.'s current emotional or physical condition. As to the second item, the court made no determination that the length of time C.H. has been in foster care created any extraordinary physical or emotional need on her part which would justify avoiding the ICWA placement preferences. As a result, while these factual statements may be correct, we conclude they do not constitute extraordinary physical or emotional needs as contemplated by the guidelines.

¶29.Next, the District Court concluded that C.H.'s strong emotional bond with the Alberdas constituted an extraordinary emotional need. It is undisputed that C.H. has bonded with the Alberdas and that a change in custody would be emotionally painful. As stated above, however, the parties seeking to avoid the ICWA placement preferences have the burden of establishing that C.H.'s emotional bond with the Alberdas is an extraordinary emotional need constituting good cause, and the Alberdas and DPHHS advance no authority under which emotional bonding properly may be considered an extraordinary emotional need. Indeed, the emotional attachment between a non-Indian custodian and an Indian child should not necessarily outweigh the interests of the Tribe and the child in having that child raised in the Indian community. See Mississippi Band of Choctaw Indians v. Holyfield (1989), 490 U.S. 30, 54, 109 S.Ct. 1597, 1611, 104 L.Ed.2d 29, 50; see also In re Adoption of M.T.S. (Minn. App. 1992), 489 N.W.2d 285, 288. Moreover, a conclusion that an Indian child should be placed with a non-Indian foster parent because of a strong emotional bond is essentially a determination that it is in the child's best interests to be so placed. See M.T.S., 489 N.W.2d at 288. As stated above, while the best interests of the child is an appropriate and significant factor in custody cases under state law, it is an improper test to use in ICWA cases because the ICWA expresses the presumption that it is in an Indian child's best interests to be placed in accordance with the statutory preferences. Riffle II, 277 Mont. at 393-94, 922 P.2d at 514-15. To allow emotional bonding--a normal and desirable outcome when, as here, a child lives with a foster family for several years--to constitute an "extraordinary" emotional need would essentially negate the ICWA presumption. Consequently, we conclude that C.H.'s emotional attachment to the Alberdas does not constitute an extraordinary emotional need sufficient to establish good cause to avoid the ICWA placement preferences.

¶30.The District Court stated the sixth item constituting an extraordinary physical or emotional need of C.H. as "[t]he fact that C.H. is deemed to be a high risk child because of

all of her misfortune." This statement essentially reiterates the court's earlier determination that C.H. has extraordinary physical or emotional needs because she is at high risk for developing emotional or physical disorders such as attachment disorder and fetal alcohol effect. As we concluded above, however, no evidence in the record establishes that C.H. will develop such disorders and the risk that she might develop such problems in the future is too speculative a standard on which to base a determination of whether good cause exists to avoid the ICWA placement preferences.

¶31.As the seventh item in its list of extraordinary physical or emotional needs, the court concluded that C.H. needs "a safe, secure and stable environment particularly during this critical phase of her life" and that such an environment had been--and will continue to be-- provided by the Alberdas. It is undisputed that C.H. needs a safe, secure and stable environment and that the Alberdas are able to provide such a home. However, the District Court made no findings that the Ehrets would not or could not provide a stable and loving home environment for C.H. Moreover, the record reflects the Ehrets have received training on caring for children with emotional and physical problems and are currently caring for a young child with possible fetal alcohol effect. In other words, on this record, both the Ehrets and the Alberdas are capable of providing the type of home which the court determined C.H. needs. The District Court's conclusion that the Alberdas' history with C.H. and their experience in caring for disturbed children weighed in their favor amounts to a determination that it is in C.H.'s best interests to remain with the Alberdas. Again, however, such an approach ignores the presumption expressed by the ICWA that it is in the child's best interests to be placed in a home meeting one of the § 1915(a) placement preferences. See Riffle II, 277 Mont. at 393-95, 922 P.2d at 514. Here, as in other statements, the District Court failed to accord the Ehrets and the Tribe the ICWA presumption favoring placement with the Ehrets as a statutorily-preferred family.

¶32.Furthermore, the District Court's focus on "this critical phase" of C.H.'s life appears to relate to earlier findings of fact based on expert witness testimony that a secure and stable environment for a child with C.H.'s history is most important during the first two years of her life and an attachment disorder is most likely to occur where a child is moved between two or three different homes during those first two years. In this regard, we observe that C. H. was born in March of 1997, placed with the Alberdas in June of 1997 and was nearing her second birthday at the time of the District Court hearing. Thus, C.H. had been in the Alberdas' home--a stable and secure environment--for almost all of what the court characterized as the "critical phase of her life" and, as a result, the likelihood of C.H. experiencing an attachment disorder upon removal from the Alberdas is diminished. On

this record, we conclude that C.H.'s need for a safe, secure and stable environment does not constitute an extraordinary physical or emotional need as contemplated by the ICWA.

¶33.The District Court also concluded that C.H.'s need to be protected from the family member who abused her constituted an extraordinary physical or emotional need and that, if placed with the Ehrets, who are extended family members, the potential exists that she would come into contact with her abuser. In this regard, the Idaho Supreme Court has held that the need to avoid contact with a family member which could result in emotional or physical damage to a child can be an extraordinary physical or emotional need justifying placement outside the ICWA placement preferences. See Matter of Baby Boy Doe, 902 P.2d at 488. There, the trial court had found beyond a reasonable doubt that custody by the natural father was likely to cause the child serious emotional damage and the evidence established that, if the child were placed with the proposed Indian family consisting of a paternal aunt and uncle, the natural father would have contact with--and a role in teaching--the child. Matter of Baby Boy Doe, 902 P.2d at 488. In other words, direct and ongoing contact with the undesirable parent was certain to occur if the placement preferences were followed.

¶34.Here, the District Court determined that C.H.'s abuser, although never specifically identified, necessarily was one of several immediate family members living in the Bozeman, Montana, area where the Alberdas also reside. If placed with the Ehrets, however, C.H. would live in Oregon, a great enough distance from Bozeman to substantially lessen the chance of contact with her unidentified abuser. Moreover, Tena Ehret testified she was not close to her immediate family in Montana and saw them, at most, once a year. The District Court also noted in its findings of fact that Tena Ehret testified she would get a restraining order against those persons suspected of abusing C.H. and would call the police if any of them showed up in Oregon.

¶35.Consequently, while the District Court's determination that potential exists for C.H. to come into contact with her abuser if she is placed with the Ehrets is not incorrect, there is no evidence that such contact is certain, or even likely, to occur. In addition, the potential for C.H. to come in contact with her abuser also exists if she remains with the Alberdas in Bozeman. Finally, any potential contact with her unidentified abuser while residing with the Ehrets hundreds of miles from Bozeman would be in passing rather than direct and ongoing. Matter of Baby Boy Doe is distinguishable on these bases. As with the risk of future physical and emotional problems, a slight risk of passing contact with an unidentified abuser in the future is too nebulous a standard on which to determine that

good cause exists. We conclude that the possibility C.H. would have contact with her abuser sometime in the future does not constitute an extraordinary physical or emotional need to justify avoiding the § 1915(a) placement preferences.

¶36. As the final item in the District Court's list of C.H.'s extraordinary physical and emotional needs, the court stated that "[t]he balance described above, fall[s] convincingly in favor of the Alberdas." This statement clearly reflects the court's application of a best interests of the child balancing test which, as discussed above, is inappropriate in an ICWA proceeding. See Riffle II, 277 Mont. at 393-95, 922 P.2d at 514-15. Moreover, the statement makes no reference to C.H.'s needs, either physical or emotional, and we conclude it does not amount to an extraordinary physical or emotional need.

¶37. Based on the record before us, we conclude that none of the nine items listed in the District Court's fifth conclusion of law constitutes an extraordinary physical or emotional need of C.H. as contemplated by the guidelines. Consequently, we hold that the District Court's ultimate conclusion that good cause exists to deviate from the adoptive placement preferences set forth in 25 U.S.C. § 1915(a) based on C.H.'s extraordinary physical and emotional needs is an incorrect application of the law to the facts of this case. As a result, we further hold that the District Court erred in denying the adoptive placement with the Ehrets and in ordering DPHHS to commence proceedings for the Alberdas to formally adopt C.H.

¶38. In light of our holdings, it is clear that proceedings must be initiated for the Ehrets, who are a statutorily-preferred family under § 1915 of the ICWA, to adopt C.H. We note that we are not reversing the District Court's continuation of foster care placement of C.H. with the Alberdas because that portion of the court's order was not challenged on appeal. At the same time, we are aware that C.H. and the Ehrets have had only a limited opportunity to develop a relationship to date and that the ultimate adoption of C.H. by the Ehrets--after such a long placement with the Alberdas--will be emotionally painful for her. The situation is complicated by the substantial distance between C.H.'s current home in Bozeman and the Ehrets' home in Oregon, making a gradual transition in care and building of relationships more difficult. Nonetheless, we encourage the parties to work together during the pendency of adoption proceedings so that C.H.'s transition to the Ehrets will result in as little emotional trauma to her as possible.

¶39. Reversed and remanded to the District Court for entry of an order directing DPHHS to promptly commence proceedings for the Ehrets to formally adopt C.H.

/S/ KARLA M. GRAY

We concur:

/S/ J. A. TURNAGE

/S/ TERRY N. TRIEWEILER

/S/ JAMES C. NELSON